UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,       )
                                )
        v.                       )        No. 4:07 CR 411 CDP
                                )                       DDN
CHRISTOPHER SCHRAUD,            )
                                )
                Defendant.       )

**ORDER AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on October 17, 2007.

**1. Motion to dismiss the indictment**

Defendant Christopher Schraud is charged by indictment with three counts of introducing a misbranded drug (Dextromethorphan Hydrobromide (DXM)) into interstate commerce. Defendant Schraud has moved to dismiss the indictment. (Doc. 30.) He argues the indictment is legally insufficient on its face in several respects. In particular, he argues the indictment fails to allege in legally sufficient terms his intent to deal with DXM as a "drug," that the DXM was misbranded, and that he introduced DXM into interstate commerce with an intent to defraud and mislead. (Docs. 31, 38.)

To be legally sufficient on its face, in a plain, concise, and definite written statement, the indictment must contain all the essential elements of each offense charged, it must fairly inform the defendant of the charges against which he must defend, and it must allege sufficient information to allow him to plead a conviction or an acquittal as a bar to a future prosecution. See U.S. Const. amends. V and VI; Fed. R. Crim. P. 7(c)(1); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Carter, 270 F.3d 731, 736 (8th Cir. 2001); United States v. White, 241 F.3d 1015, 1021 (8th Cir. 2001).

Nevertheless, "[a]n indictment should not be read in a hyper technical fashion and should be 'deemed sufficient unless no reasonable construction can be said to charge the offense.'" <u>United States v. O'Hagan</u>, 139 F.3d 641, 651 (8th Cir. 1998) (quoting <u>United States v. Morris</u>, 18 F.3d 562, 568 (8th Cir. 1994)). In determining whether an indictment is subject to dismissal, the allegations contained in the indictment are accepted as true. <u>United States v. Farm & Home Sav. Ass'n</u>, 932 F.2d 1256, 1259 n.3 (8th Cir. 1991).

The indictment encompasses 25 paragraphs. The general allegations section describes the relevant duties and enforcement responsibilities of the Food and Drug Administration (FDA) and the legal requirements for placing drugs in interstate commerce. (Doc. 2 at ¶¶ 1-2.) The indictment describes the law regarding the misbranding and labeling of drugs. (<u>Id.</u> at ¶¶ 3-9.) The indictment describes the legal and medical status of DXM. (<u>Id.</u> at ¶¶ 10-15.) The indictment then describes the relevant business activities of defendant Schraud and the operation of his business, Pharmacom LLC, and how they dealt with DXM. (<u>Id.</u> at ¶¶ 15-23.) The indictment concludes with allegations of the three counts against defendant. (<u>Id.</u> at ¶¶ 24-25.)

The indictment charges Schraud with three counts of placing DXM in interstate commerce in a misbranded condition, in violation of the Federal Food, Drug, and Cosmetic Act (FDCA), specifically 21 U.S.C. §§ 331(a)(substantive provision) and 333(a)(2)(penalty provision), and 18 U.S.C. § 2. (Doc. 2 at 8.) The essential elements of the charged violations of § 331(a) are: the defendant (1) knowingly (2) introduced (3) into interstate commerce (4) a drug (5) that was misbranded. 21 U.S.C. § 331(a).

**Intent to use DXM as a "Drug"**

Schraud first argues the indictment fails to plead legally sufficient facts that indicate his intent to use DXM as a "drug" within the meaning of the FDCA. The undersigned disagrees. Under the FDCA, a "drug" is defined to include any,

> (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended

> to affect the structure or any function of the body of man
> or other animals; and (D) articles intended for use as a
> component of any article specified in clause (A), (B), or (C)
> of this paragraph.

21 U.S.C. § 321(g)(1). The issue of whether an article is a drug under the FDCA depends on its intended use. United States v. Livdahl, 459 F. Supp. 2d 1255, 1259 (S.D. Fla. 2005). Under FDA regulations, the intended use refers to the objective intent of the persons legally responsible for labeling the drug. Id. (citing 21 C.F.R. § 201.128). The individual's objective intent can be gleaned from a number of sources. See 21 C.F.R. § 201.128; see also United States v. An Article Consisting of 216 Cartoned Bottles, More or Less, 409 F.2d 734, 739 (2d Cir. 1969). For example, the circumstances surrounding the article's distribution or the expressions of the one distributing the article can determine objective intent. 21 C.F.R. §§ 201.128, 801.4. Likewise, the objective intent of the individual may be shown by the labeling claims, the advertising matter, or any oral or written statements by the individual or his representatives. Id. Indeed, "[i]t is well settled that the intended use of a product may be determined from its label, accompanying labeling, promotional material, advertising and any other relevant source. . . ." An Article Consisting of 216 Cartoned Bottles, 409 F.2d at 739 (emphasis added).

In this case, the indictment specifically alleges that during 2005 and 2006 Schraud received bulk quantities of DXM from a chemical supplier in New Jersey, in "25 kilogram lots of DXM in blue plastic barrels." (Doc. 2 at ¶ 16.) Before redistributing the DXM, the indictment alleges that Schraud repackaged it into smaller plastic bags. (Id.) The indictment also alleges that "Schraud well knew the DXM would ultimately be used for human consumption as a drug to achieve a psychedelic effect, or 'to get high' or hallucinate." (Id. at ¶ 18.) The indictment alleges Schraud's customers used personal email addresses rather than business email addresses, and used post office boxes or residential addresses instead of business addresses. (Id. at ¶ 19.) The indictment alleges the personal email accounts included addresses such as "ScottytheHoty###, Heineken, Eyeball#####, Cropunk####, Meglalomaniac#, Kuhlxcrunr####, Zenman####, Smokecrackandhailsanta,

lafingas##, and mushroommuncher###."  (<u>Id.</u>)  Finally, the indictment
alleges DXM is a drug within the meaning of the FDCA, 21 U.S.C.
§ 321(g), when used or sold for recreational purposes.  (<u>Id.</u> at ¶ 14.)

In plain language, the indictment alleges Schraud <u>knew</u> - and how
he knew - the DXM would be used to achieve a psychedelic or
hallucinogenic effect.  <u>See</u> 21 C.F.R. §§ 201.128, 801.4 (objective
intent may be shown if "the article is, with the knowledge [of its
distributor], offered and used for a purpose for which it is neither
labeled nor advertised.")  "Hallucinogens are drugs which affect the
central nervous system in such a fashion as to cause the user to have
a distorted sense of reality."  <u>Iske v. United States</u>, 396 F.2d 28, 29
(10th Cir. 1968).  By touching the central nervous system, an article
with a hallucinogenic effect affects the structure of man, and therefore
satisfies the FDCA's definition of a drug.  <u>See</u> 21 U.S.C. § 321(g); <u>see
id.</u>  The indictment sufficiently alleges that Schraud intended the DXM
shipments of April 29, 2005 (Count 1), December 13, 2005 (Count 2), and
May 22, 2006 (Count 3), to be used as drugs, as defined by the FDCA.

Schraud argues that the specific facts alleged in the indictment,
which he believes the government is using to prove his objective intent,
provide only speculative and insubstantial proof of his intent and,
therefore, whether the DXM was a "drug."  This argument attacks the
legal sufficiency of the proof of a required element of the government's
case.  This is similar to seeking summary judgment in a civil case.  <u>See
United States v. Critzer</u>, 951 F.2d 306, 307 (11th Cir. 1992).  Criminal
prosecutions are not subject to such pretrial summary judgment
determinations.  <u>Id.</u>  As noted above, the indictment is legally
sufficient on its face as to the question of Schraud's intent to deal
with DXM as a drug, satisfying his due process right of notice.  At this
stage, that is enough to survive the defendant's motion to dismiss the
indictment.  <u>See</u> <u>Hamling</u>, 418 U.S. at 117.


**Misbranded DXM**

Schraud also argues the indictment fails to sufficiently allege
that the DXM was misbranded under the law.  The undersigned disagrees.
The indictment alleges four ways in which the shipments of DXM were

- 4 -

misbranded.  First, the indictment alleges the DXM shipments were misbranded under 21 U.S.C. § 352(a), because the labeling was false and misleading because  it indicated the shipments of DXM were intended for research and development applications.  Second, the indictment alleges the DXM shipments were misbranded under 21 U.S.C. § 352(f)(1), because the labeling did not bear adequate directions for use.  Third, the indictment alleges the DXM shipments were misbranded under 21 U.S.C. § 352(f)(2), because the labeling did not bear adequate warnings against use in pathological conditions and by children, where its use could be dangerous to health, and against unsafe dosage and methods and duration of administration and application of the drug, as would be necessary for the protection of users.  Fourth, the indictment alleges the DXM shipments were misbranded under 21 U.S.C. § 352(o), because the DXM was manufactured, prepared, propagated, compounded, and processed in a establishment that was not registered with the FDA.  (Doc. 2 at 7.)

<u>21 U.S.C. § 352(a)</u>

Schraud attacks each of these allegations.  On the first specification of misbranding, Schraud argues the indictment has failed to adequately plead the labeling was materially false and misleading, and the indictment fails to provide the full context of the statements appearing in the labeling – though he does not state what the government has omitted.  Under § 352(a), a drug is misbranded if "its labeling is false or misleading in any particular."  21 U.S.C. § 352(a).  A label is misleading if it fails to reveal material facts.  21 U.S.C. § 321(n); 21 C.F.R. § 1.21(a).  A fact is material if it has a natural tendency to influence, or is capable of influencing, the decision of the entity to which it is addressed.  <u>Kungys v. United States</u>, 485 U.S. 759, 770 (1988).

In this case, the indictment alleges Schraud labeled the DXM packages he shipped to Missouri as "Dextromethorphan Hydrobromide, reagent grade."  (Doc. 2 at ¶ 18.)  The indictment adds that the labels also stated, "This product is intended for research and development applications."  (<u>Id.</u>)  Despite these purported labels, the indictment alleges Schraud knew the DXM packages would be used for human

consumption as recreational drugs, based, in part, on his customers' use of P.O. Boxes and residential addresses, and personal email accounts. (Id. at ¶¶ 18, 19.) Accepting these allegations as true, the indictment alleges legally sufficient facts to indicate the DXM labels were materially false and misleading. The indictment is not defective for failing to specifically use the word "materiality" in its allegations. United States v. Adler, 623 F.2d 1287, 1292 n.6 (8th Cir. 1980). Likewise, failing to provide the full evidentiary context of the label does not render the indictment defective; the false and misleading nature of the label is apparent from the portion quoted. See United States v. Syring, --- F. Supp. 2d ----, No. 07-204 (CKK), 2007 WL 4105545, at *9 (D.D.C. Nov. 19, 2007) (denying motion to dismiss indictment even though the indictment provided "meager context" and did not "present a compelling case.")

## 21 U.S.C. § 352(f)(1)

On the second specification of misbranding, Schraud argues the labeling enjoyed a research exemption, and therefore, did not have to comply with 21 U.S.C. § 352(f)(1). Under § 352(f)(1), a drug is deemed to be misbranded unless its labeling bears adequate directions for use. 21 U.S.C. § 352(f)(1). That said, labeling specifying the adequate directions for use are not required where the drug is shipped or sold to "persons regularly and lawfully engaged" in research or testing of the drug and where the drug will only be used for research or testing purposes. 21 C.F.R. § 201.125.

In this case, the indictment specifically alleges "Schraud knew that his customers were not researchers purchasing DXM for use during legitimate scientific research. Schraud's customers included numerous customers who used personal rather than business e-mail addresses . . . [and] often used post office boxes or residential addresses, not business addresses." (emphasis added)(Doc. 2 at ¶ 19.) Labeling the DXM shipments "for research" does not make it so. See Livdahl, 459 F. Supp. 2d at 1260 (packaging stated the product was "For Research Purposes Only Not for Human Use"). To hold otherwise would establish a simple method and disclaimer for avoiding FDA detection and

regulation.  <u>Id.</u>  The indictment pleads legally sufficient facts to establish Schraud misbranded the DXM shipments under 21 U.S.C. § 352(f)(1).

<u>21 U.S.C. § 352(f)(2)</u>

On the third specification of misbranding, Schraud argues the labeling required by 21 U.S.C. § 352(f)(2) only applies to over-the-counter drug products and only applies when the DXM is intended as an oral antitussive.  Because the indictment alleges he intended the DXM for use as a hallucinogenic, he argues it was not a drug product and not intended as an oral antitussive, making the labels required by § 352(f)(2) unnecessary.  Under § 352(f)(2), a drug shall be deemed to be misbranded unless its labeling bears

> such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . .

21 U.S.C. § 352(f)(2).

Section 352(f)(2) is a general provision.  <u>Ellis v. C.R. Bard, Inc.</u>, 311 F.3d 1272, 1288 (11th Cir. 2002).  The Code of Federal Regulations specifies the particular warning labels required for antitussive drug products.  21 C.F.R. § 341.74.  For antitussive products containing DXM, the labeling of the product must state, "Adults and children 12 years of age and over: Oral dosage is 10 to 20 milligrams every 4 hours or 30 milligrams every 6 to 8 hours, not to exceed 120 milligrams in 24 hours, or as directed by a doctor."  21 C.F.R. § 341.74(d)(1)(iii).  The indictment sets out this labeling requirement in ¶ 12.  (Doc. 2 at ¶ 12.)

In this case, the indictment alleges Schraud misbranded the DXM shipments under 21 U.S.C. § 352(f)(2).  (<u>Id.</u> at ¶ 25(c)).  Under the plain language of the statute, a drug shall be deemed to be misbranded unless its labeling bears "such adequate warnings against use in those pathological conditions . . . or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ."  21 U.S.C.

- 7 -

§ 352(f)(2).  The indictment alleges that Schraud knew that his DXM
shipments would be used for human consumption and not research.  (Doc.
2 at ¶¶ 18, 19.)  The indictment also alleges the labels did not include
directions for human consumption or suggested dosage amounts as required
by FDA regulations.  (Id.)  Consumed in large or excessive doses, DXM
has caused brain damage, seizure, loss of consciousness, irregular
heartbeat, and death.  (Id. at ¶ 14.)  Accepting these alleged facts as
true, the indictment states legally sufficient facts to establish a
violation of § 352(f)(2).

Schraud argues the federal regulations governing dosage apply only
to DXM used in drug products and over-the-counter cough medicines.
Accepting this argument would lead to an illogical result: the law would
reach the misbranding of DXM sold within over-the-counter cough
medicines, but would not reach the misbranding of DXM sold as a
hallucinogenic.  The Supreme Court has counseled against reading the
FDCA so narrowly.  Kordel v. United States, 335 U.S. 345, 349 (1948).
"[T]here is no canon against using common sense in reading a criminal
law, so that strained and technical constructions do not defeat its
purpose by creating exceptions from or loopholes in it."  Id.  The "high
purpose" underlying the passage of the FDCA also supports this reading
of the indictment.  See id.

Congress passed the FDCA in 1906 with the stated purpose of keeping
impure and adulterated food and drugs out of the channels of commerce.
United States v. Dotterweich, 320 U.S. 277, 280 (1943).  In 1938,
Congress extended the FDCA's reach to cover "illicit and noxious
articles and stiffened the penalties for disobedience."  Id.  "The
purposes of this legislation thus touch phases of the lives and health
of people which, in the circumstances of modern industrialism, are
largely beyond self-protection.  Regard for these purposes should infuse
construction of the legislation if it is to be treated as a working
instrument of government and not merely as a collection of English
words."  Id.

Finally, Schraud argues that requiring dosage warnings for bulk
drug ingredients would criminalize the everyday interstate
transportation of drugs and chemicals between manufacturers and

distributors. This is not the case. The indictment alleges Schraud mislabeled DXM as it concerned shipments <u>to individuals</u>. The federal regulations governing DXM dosages concern the amounts appropriate for <u>adults and children</u>. The interpretation of the FDCA looked to its stated purpose "to <u>protect consumers</u> who . . . are largely unable to protect themselves . . . ." <u>Kordel</u>, 335 U.S. at 349 (emphasis added). Nothing in this opinion or in the indictment speaks to the labeling requirements for transactions between commercial businesses. The indictment makes legally sufficient allegations of a violation of § 352(f)(2).

<u>21 U.S.C. § 352(o)</u>

On the fourth specification of misbranding, Schraud argues he enjoyed a research exemption, and therefore, did not have to comply with 21 U.S.C. § 352(o). Under § 352(o), a drug is deemed to be misbranded if "it was manufactured, prepared, propagated, compounded, or processed in an establishment in any State not duly registered" with the FDA. 21 U.S.C. § 352(o). The terms "manufacture, preparation, propagation, compounding, or processing" include repackaging the container, wrapper, or labeling of any drug package in an attempt to distribute the drug. 21 U.S.C. § 360(a)(1).

In this case, the indictment alleges Schraud received bulk quantities of DXM, repackaged and relabeled the bulk quantities into smaller plastic bags, and then shipped these bags to customers throughout the United States. (Doc. 2 at ¶ 16.) The indictment alleges Schraud manufactured, prepared, propagated, compounded, and processed the DXM in an unregistered establishment. (<u>Id.</u> at ¶ 25(d).) In response, Schraud argues § 352(o) does not apply to individuals manufacturing or processing a drug for research purposes only. As noted above, Schraud's assertion is insufficient to demean the legally sufficient allegations in the indictment. His factual assertions must await trial for vindication.

**Intent to Defraud and Mislead**

In his final argument, Schraud argues the indictment fails to sufficiently allege that he introduced DXM into interstate commerce with an intent to defraud and mislead. Again, the undersigned disagrees. The indictment charges Schraud with violating 21 U.S.C. § 333(a)(2). (Doc. 2 at 8.) Under § 333(a)(2), anyone who introduces a misbranded drug into interstate commerce, "with the intent to defraud or mislead . . . shall be imprisoned for not more than three years or fined not more than $10,000, or both." 21 U.S.C. § 333(a)(2). The specific intent requirement of § 333(a)(2) requires proof of misbranding under § 331, and proof of an intent to defraud and mislead which is connected to the misbranding violation. United States v. Mitcheltree, 940 F.2d 1329, 1349 (10th Cir. 1991). The intent to defraud and mislead must also be material. United States v. Watkins, 278 F.3d 961, 964-65 (9th Cir. 2002). A fact is material if it "has a natural tendency to influence, or was capable of influencing, the decision of" the entity to which it is addressed. Kungys, 485 U.S. at 770.

In this case, the indictment alleges Schraud labeled the DXM packages for "research and development applications," even though he "well knew the DXM would ultimately be used for human consumption as a drug to achieve a psychedelic effect, or 'to get high' or hallucinate." (Doc. 2 at ¶ 18.) The indictment also alleges "Schraud knew that his customers were not researchers purchasing DXM for use during legitimate scientific research." (Id. at ¶ 19.) The indictment alleges Schraud was aware of the dangers created by the sale of DXM. (Id. at ¶ 20.) Finally, the indictment alleges "Schraud sold DXM while falsely representing that it was a research chemical that was not intended for human use in an attempt to evade the regulatory authority of the FDA." (Id. at ¶ 23.)

Schraud argues the indictment fails to sufficiently allege the intent element of § 333(a)(2). In particular, he claims the indictment fails to allege that his customers were ever defrauded or misled. This argument is unavailing. See United States v. Bradshaw, 840 F.2d 871, 874 (11th Cir. 1988). In that case, Bradshaw was convicted of selling misbranded steroids with an intent to defraud or mislead under

§ 333(b).[1]  <u>Id.</u> at 872.  Bradshaw had sold steroids through the mail to two customers.  <u>Id.</u> at 873.  The customers had willingly purchased the steroids and received exactly what they had ordered.  <u>Id.</u>  As a result, Bradshaw argued no one had been defrauded or misled.  <u>Id.</u>

On appeal, the Eleventh Circuit affirmed Bradshaw's conviction. <u>Id.</u> at 872.  The intent to defraud and mislead language contained in § 333(b) was not limited to the end user.  <u>Id.</u> at 874.  "To the contrary, the structure of the statutory scheme, the purpose of the statute, and the case law persuade us that Congress meant to encompass conduct intended to defraud government enforcement agencies."  <u>Id.</u>; <u>see also</u> <u>Mitcheltree</u>, 940 F.2d at 1347 ("The government may premise criminal liability under § 333(a)(2) based upon an intent to mislead or defraud not only natural persons, but also government agencies . . . .").

Whether or not Schraud's customers were misled or defrauded, the indictment alleges Schraud intended to defraud the FDA.  The indictment alleges Schraud misbranded DXM, and that he falsely represented to the FDA that the shipments of DXM were intended for research purposes, knowing they were not.  (Doc. 2 at ¶¶ 18, 19, 23, 25.)  Given the various exceptions for research uses, claiming the DXM shipments were for research purposes when they were not constitutes a material statement.  Accepting these allegations as true, the indictment states legally sufficient facts to establish a violation of § 333(a).

The motion to dismiss the indictment should be denied.

## 2.  Motion to strike portions of the indictment

Schraud has moved to strike surplusage.  Schraud argues the phrase, "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," and its accompanying citation, "21 U.S.C. § 321(g)(1)(B), should be stricken from ¶ 4 of the indictment.  In particular, Schraud argues the language is superfluous and unnecessary to the allegations of misbranding.  (Doc. 32.)

---

[1]In <u>Bradshaw</u> the court of appeals interpreted the intent to defraud language of § 333(b).  <u>Bradshaw</u>, 840 F.2d at 874.  However, <u>Bradshaw</u> has been applied to cases interpreting the intent to defraud language of § 333(a)(2).  <u>Mitcheltree</u>, 940 F.2d at 1348.

Under Federal Rule of Criminal Procedure 7(d), a court may strike surplusage from the indictment or information, on the defendant's motion. Fed. R. Crim. P. 7(d). A motion to strike surplusage from an indictment should be granted only where it is clear that the allegations within the indictment are not relevant to the charge or the allegations contain inflammatory and prejudicial material. <u>United States v. Michel-Galaviz</u>, 415 F.3d 946, 948 (8th Cir. 2005). Evidence is relevant if it has any tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Motions to strike surplusage are not granted lightly, and carry a significant burden of persuasion. <u>United States v. Augustine Med., Inc.</u>, No. CRIM. 03-321(1-8) ADM, 2004 WL 502183, at *4 (D. Minn. Mar. 11, 2004). In cases of factual and legal complexity, background information is particularly helpful for providing context to the alleged criminal conduct. <u>Id.</u>

In this case, the indictment alleges Schraud obtained bulk quantities of DXM, repackaged the drug, and then shipped it to various purchasers in the St. Louis area. (Doc. 2 at ¶¶ 16-17.) These allegations form the basis of the allegations that Schraud introduced misbranded DXM into interstate commerce. (<u>Id.</u> at ¶¶ 24-25.) The indictment alleges that in small doses, DXM has a medicinal purpose and is used in over-the-counter cough medicines. (Doc. 2 at ¶ 10); <u>United States v. Johnson</u>, 471 F.3d 764, 764-65 (7th Cir. 2006), <u>petition for cert. filed</u>, (Mar. 12, 2007) (No. 06-10559). In large doses, the indictment alleges, DXM acts as an intoxicant or hallucinogenic and becomes dangerous, leading to brain damage, seizure, loss of consciousness, irregular heartbeat, and death. (Doc. 2 at ¶ 14); <u>Johnson</u>, 471 F.3d at 764-65.

Paragraph 3 of the indictment states the FDCA, 21 U.S.C. § 331(a), prohibited introducing misbranded "drugs" into interstate commerce. (Doc. 2 at ¶ 3.) Paragraph 4 of the indictment states the definition of "drugs" under the FDCA. (<u>Id.</u> at ¶ 4.) Under the FDCA, drugs include articles "intended for use in the cure, mitigation, treatment, or prevention of disease in man . . . ." (<u>Id.</u>) Paragraph 10 of the

indictment alleges that DXM is a component of cough medicine, a drug used for the mitigation or treatment of a disease. Schraud is accused of shipping misbranded DXM. The definition in paragraph 4 provides relevant background to the charges against defendant.

The motion to strike surplusage is denied.


### 3.  Motion for bill of particulars

Schraud has moved for a bill of particulars. In particular, Schraud has requested:

> A. The identity of the FDA official who requested information from the Defendant as referenced in the indictment (at ¶ 23); the date, time and place such request was made; and the authority under which the request was made;

> B. The victim or victims Defendant defrauded or misled by introducing into interstate commerce a misbranded drug manufactured in a facility not duly registered with FDA; and

> C. The identity of the person who allegedly sent a tele-facsimile to Pharmacom as described at ¶ 22 of the indictment, and to whom Pharmacom or the Defendant sold DXM.

(Doc. 33 at 3.)

A court may direct the government to file a bill of particulars. Fed. R. Crim. P. 7(f). A bill of particulars serves to inform the defendant of the nature of the charges against him with sufficient precision to enable him to reasonably prepare for trial, and to avoid or minimize the threat of surprise at trial. United States v. Hernandez, 299 F.3d 984, 989-90 (8th Cir. 2002). A bill of particulars is not a mechanism for merely learning the names of witnesses, evidentiary details, or the government's theory of the case. United States v. Trevino, No. 4:05CR690 RWS (FRB), 2007 WL 1174852, at *8 (E.D. Mo. Apr. 20, 2007), report and recommendation adopted by, 2007 WL 1452537 (E.D. Mo. May 15, 2007). A bill of particulars is not intended to act as a discovery tool. United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993).

In this case, all three of Schraud's requests are of a factual discovery nature, unnecessary to avoid unfair surprise at trial. In the

first request, Schraud seeks the identity of an FDA official and the time and circumstances of the official's request for information. This request does not seek information without which the defendant would be unable to prepare a defense or would be surprised at trial. <u>See</u> <u>United States v. Ladoucer</u>, No. 07-165 (ADM/JSM), 2007 WL 3396437, at *6 (D. Minn. Aug. 30, 2007) (denying motion for bill of particulars seeking the dates, times, and places of alleged wrongdoing), <u>report and recommendation adopted by</u>, 2007 WL 3051434 (D. Minn. Oct. 17, 2005). The request for the identities of the FDA official and the sender of the tele-facsimile are not the proper subjects of a bill of particulars. <u>See</u> <u>United States v. Tovar-Aldaco</u>, No. S1-4:06CR531 CDP, 2007 WL 2021859, at *2 (E.D. Mo. July 6, 2007) (denying motion for bill of particulars seeking the identity of witnesses to events or acts listed in the indictment). The request for the names of the defrauded victims is also not the proper subject of a bill of particulars. <u>See</u> <u>United States v. Hill</u>, 589 F.2d 1344, 1351-52 (8th Cir. 1979) (affirming the denial of a motion for a bill of particulars seeking the names of the individuals defrauded).

The motion for a bill of particulars is denied.

### **4. Motion to suppress evidence**

Defendant has moved to suppress evidence (oral motion Doc. 11), and to suppress statements (Doc. 21). The government has moved for a hearing on the admissibility or not of any arguably suppressible evidence (oral motion Doc. 12), and for a pretrial determination of the admissibility of defendant's statements (Doc. 14).

From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### **FACTS**

1. In June 2006, Drug Enforcement Agency (DEA) Diversion Investigator (DI) Brian McClune investigated the illegal manufacturing and distribution of Ecstacy-like pills in the East St. Louis area by Harvey Jackson. Jackson was believed to distribute the pills in nightclubs and adult clubs in the St. Louis area. Jackson also was

believed to manufacture the pills using DXM, the active ingredient in over-the-counter oral cough medicine.  If taken in high enough doses the drug produces euphoric and/or hallucinogenic effects similar to those of the drug Ecstacy.  Jackson received the DXM powder in bulk shipments and made the pills with a pill press.  Jackson's supplier of DXM was identified as Pharmacom, LLC.

2.    Pharmacom, LLC is a business owned and operated by defendant Christopher Schraud.  Pharmacom sells bulk chemicals through its internet website, www.Pharmacomdirect.com.  Schraud was the sole employee of the business.

3.    During June or July 2006, after learning the source of the DXM, DI McClune developed his investigation of Jackson through Schraud, Jackson's supplier of DXM.  McClune arranged for a controlled sale and delivery of DXM by Schraud to law enforcement rather than to Jackson. Schraud completed the sale of DXM to law enforcement in August 2006. Jackson was prosecuted in the Southern District of Illinois on gun and drug charges.  During this period of time, Schraud was very aware of the government's concerns and investigation of DXM, was cooperative with the agency in its investigation of Jackson, and never required the government to deal with him through counsel.

4.    In its investigation, DI McClune decided to issue administrative subpoenas to Schraud.  On September 12, 2006, Diversion Investigators McClune and Norina Monaco and FDA Special Agent Chuck Grinstead went to serve a subpoena on Christopher Schraud in Poughkeepsie, New York, and to interview him there.  The agents first attempted to find Schraud at the business address of Pharmacom.  Unable to locate Schraud there, they traveled to Schraud's residence.  There the agents met Schraud's father at the front door and requested that he have Schraud contact the agents.

5.    After they left Schraud's residence, while the agents were driving to their hotel, the Courtyard By Marriott in Poughkeepsie, Schraud contacted them by phone.  DI McClune told Schraud on the phone that they were in the area and would like to speak with him regarding the ongoing investigation of Harvey Jackson.  Schraud agreed to the interview with the agents at their hotel.

6. Later on September 12, 2006, Schraud drove himself to the agents' hotel. McClune met Schraud in the lobby and escorted him to a banquet room in the hotel. There, he introduced the other agents to Schraud. The agents were dressed in plain clothes and were not carrying firearms. Schraud was seated across a banquet table from McClune. The banquet room door was closed but there was no obstruction between Schraud and the door. Schraud was told that the interview was voluntary and he was free to leave at any time.

7. Prior to any questioning, DI McClune presented Schraud with a "Warning and Consent to Speak" form. Gov. Ex. 1. McClune read the top portion of the form to Schraud. This portion of the form contained a "Warning of Rights" which included the right to remain silent, the right to speak with and have a lawyer present, the right to have a lawyer appointed if one cannot be afforded, and the right to stop the interrogation at any time to give him the right to talk with a lawyer. Id. At 12:28 p.m., on September 12, Schraud signed and dated the form, thereby expressly stating that he had read the statement of rights, that they were read to him, and that he understood them. Id. Although Schraud did not sign the bottom "Waiver" portion of the form, he began to answer the agents' questions without hesitation. Schraud's formal education included a year in college.

8. The interview lasted a little over an hour. In response to questions by the agents, Schraud made oral statements. The agents took a single break during the interview at which time Schraud drank a soda. Schraud did not request a lawyer or attempt to end the interview. Schraud remained cooperative during the interview; his hands did not shake and his voice did not tremble. At the conclusion of the interview, Schraud was not handcuffed or arrested; he left the hotel on his own. None of the investigators yelled at Schraud or threatened him.

## DISCUSSION

Schraud argues that his statements to the agents on September 12, 2006, should be suppressed. In particular, Schraud argues that his Miranda rights were violated, that his statements were the products of

an unlawful arrest, and that his statements were not voluntary.  (Doc. 21.)

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself.  U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself").  To safeguard an individual's Fifth Amendment rights, a person in custody must be warned, before being interrogated "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The facts of the case contradict Schraud's arguments.  Schraud was expressly advised of his constitutional rights to remain silent and to counsel before he was questioned.  The agents presented him with a "Warning and Consent to Speak" form, which he signed and dated, indicating he had read the form and understood his Miranda rights. After signing the form, Schraud answered the agents' questions without hesitation, thereby waiving his Miranda rights.  United States v. Allen, 247 F.3d 741, 766 (8th Cir. 2001)(waiver of rights was valid because it was knowing, intelligent, and voluntary, and because the interrogation was initiated by defendant).  During the interview, Schraud never requested a lawyer and never asked the agents to stop the interview. The agents did not violate Schraud's constitutional rights during the course of the interview.

Schraud also argues his statements were the product of an unlawful arrest.  None of the circumstances of Schraud's questioning, individually or in concert, considered objectively, indicate that a reasonable person in his situation would have believed that he was not free to leave.  INS v. Delgado, 466 U.S. 210, 215 (1984).  He went to the hotel on his own.  The agents never placed Schraud under arrest. He was never told he was under arrest and his freedom of movement was never restricted.  He left the hotel as he came, on his own.

Finally, Schraud argues his statements were not voluntary.  A statement is constitutionally involuntary when it is induced by the interrogating agents by threats, violence, or express or implied

promises sufficient to overcome the defendant's will and critically impair his capacity for self-determination.  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc).  Whether a confession is involuntary is judged by the totality of the circumstances, but with a focus on the conduct of the agents and the characteristics of the accused.  Id.  In this case, there is no evidence the agents engaged in coercion, deception or intimidation.  There is no evidence the agents overbore Schraud's free will or impaired his ability to not cooperate. The interview was conducted in a hotel banquet room and lasted a little over an hour.  During that time, Schraud's demeanor remained composed; his hands did not shake and his voice did not tremble.  At the end of the interview, Schraud left the hotel.  The government has shown that Schraud's statements were voluntary.

The motion to suppress statements should be denied.

Whereupon,

**IT IS HEREBY ORDERED** that the motion of the government for a hearing on the admissibility of its arguably suppressible evidence (oral motion Doc. 12) is denied as moot.

**IT IS FURTHER ORDERED** that the motion of the government for a pretrial determination of the admissibility or not of defendant's statements (Doc. 14) is sustained.

**IT IS FURTHER ORDERED** that the motions of defendant to strike surplusage from the indictment (Doc. 32) and for a bill of particulars (Doc. 33) are denied.

**IT IS HEREBY RECOMMENDED** that the motions of defendant to dismiss the indictment (Doc. 30), to suppress evidence (oral motion Doc. 11), and to suppress statements (Doc. 21) be denied.

The parties are advised they have until December 18, 2007, to file documentary objections to this Order and Recommendation.  The failure to file timely, documentary objections may result in a waiver of the right to appeal issues of fact.

## ORDER SETTING TRIAL DATE

As directed by the District Judge, this matter is set for a jury trial on the docket commencing January 14, 2008, at 8:30 a.m.


```
   /S/  David D. Noce
UNITED STATES MAGISTRATE JUDGE
```

Signed on December 4, 2007.